## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE KIMMEL'S COAL AND PACKAGING, INC., *et al.*, | : | Civil No. 1:23-CV-00351 |
| | : | |
| | : | |
| Debtors-in-Possession | : | |
| | : | |
| FULTON BANK, N.A., | : | |
| | : | Related Bankruptcy Case No. |
| Appellant, | : | 1:18-BK-01609-HWV |
| | : | |
| v. | : | |
| | : | |
| RAUSCH CREEK LAND, L.P., | : | |
| | : | |
| Appellee. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This is an appeal from a ruling entered by the United States Bankruptcy Court for the Middle District of Pennsylvania that denied a motion to compel and a motion for contempt.[1] (Doc. 1-1.) For the reasons that follow, the court will grant in part and deny in part the appeal, vacate the bankruptcy court's order, and remand for further proceedings.

---

[1] The underlying bankruptcy case is located at docket number 1:18-bk-01609, which is the docket number for four jointly administered bankruptcy cases.

# BACKGROUND[2]

The lengthy factual and procedural history of this case has been detailed by the bankruptcy court in four rulings, the last of which gives rise to the instant appeal.[3]  As explained by the bankruptcy court in the underlying bankruptcy case:

> The Debtors are Kimmel's Coal and Packaging, Inc. ("Debtor" or "Kimmel's Coal"), Meadowbrook Coal Company, Inc. ("Meadowbrook"), Michael Coal Company, Inc. ("Michael Coal"), Kimmel's Power Plant Services, Inc. ("Kimmel's Power"), and Kimmel's Mining Company, Inc. ("Kimmel's Mining" and collectively with Kimmel's Coal, Meadowbrook, Michael Coal, Kimmel's Power, and Kimmel's Mining, the "Debtors").   An involuntary chapter 7 petition was filed against Kimmel's Coal on April 19, 2018.  On June 5, 2018, the Court converted the Kimmel's Coal case to one under chapter 11.   Meadowbrook, Michael Coal, Kimmel's Power, and Kimmel's Mining each filed voluntary chapter 11 petitions on or around June 12, 2018.  On June 21, 2018, the Court ordered joint administration of the Debtors' cases.

(Doc. 8-10, p. 2.)[4]  Prior to filing for bankruptcy, the Debtors engaged in coal mining, coal sales, and coal shipping.  (*Id.* at 3.)  In order to conduct these activities, the Debtors possessed several permits from the Pennsylvania Department of Environmental Protection ("PA DEP").  (*Id.*)  To obtain these

---

[2] Any additional factual recitation that is necessary for the analysis of each specific issue is included in the Discussion section of this memorandum.

[3]  The bankruptcy court's first opinion of note here, "*Kimmel I*", was docketed on June 1, 2020. (Doc. 8-10.)  The second, "*Kimmel II*", was entered on September 28, 2021.  (Doc. 8-15.)  While *Kimmel II* was on appeal to this court, the bankruptcy court entered an order, "*Kimmel III*", on December 3, 2021.  (Doc. 8-16.)  Then, on February 17, 2023, the bankruptcy court issued an opinion and implementing order, "*Kimmel IV*", which are the subject of the instant appeal. (Docs. 17-49, 8-17.)

[4] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

permits, the PA DEP requires that an applicant post bond to secure performance of the mining company's obligation to restore an active mine "to a previous or more natural state once mining activities cease (a process known as 'reclamation')." (*Id.* at 3 n.5.) The Debtors fulfilled these bond requirements via letters of credit issued by Appellant Fulton Bank, N.A. ("Fulton Bank"). (*Id.* at 4.)

After filing for bankruptcy, the Debtors "elected to pursue the sale of substantially all their assets." (*Id.* at 5.) As such, the "Debtors entered into an Asset Purchase Agreement (the "APA") with [Appellee] Rausch Creek on June 1, 2018 for the sale of all its real property . . . and substantially all its personal property[,]" including the Debtors' mining permits. (Doc. 8-15, p. 4.) On July 6, 2018, Debtors filed a motion to approve the procedures for selling their assets (the "Sales Procedures"), which the bankruptcy court approved on July 24, 2018.[5] (Doc. 8-15, p. 4.)

On September 4, 2018, after review of an unopposed motion, the bankruptcy court approved Debtors' sale to Rausch Creek. (Doc. 17-6 ("Sale Order"); *see also* 8-10, p. 5.) The Sale Order approved "[a]ll transfers of the Assets, and of the

---

[5] The Sales Procedures are referred to by many different names. The Sale Order uses the term "Auction Motion." (Doc. 17-6, p. 2.) The bankruptcy court uses "Auction Sale Motion." (Doc. 17-49, p. 7.) For simplicity, the court uses the term "Sales Procedures" in this memorandum and edits quotes as necessary. Of note, the Sales Procedures is distinct from the "Sale Motion." (*See id.*)

Permits as set forth in the [Sales Procedures] and Sale Motion." (Doc. 17-6, p. 5; *see also* Doc. 17-49, p. 7.)

Following this sale, Rausch Creek undertook efforts to transfer mining permits from the Debtors to itself.[6] (Doc. 8-15, pp. 6–8.) As part of these efforts, Rausch Creek submitted an initial application to the PA DEP, which was informally rejected due to Rausch Creek's failure to demonstrate a legal right to conduct mining activities on all of the land covered by the permit application.[7] (*Id.* at 5.) Once it became evident that Rausch Creek had not filed a new permit application with the PA DEP after the initial application was rejected, Fulton Bank filed a motion with the bankruptcy court on April 17, 2019 to compel Rausch Creek's performance under the APA. (*Id.* at 6–8.) Specifically, Fulton Bank sought to compel Rausch Creek to continue to pursue its application with the PA DEP for transfer of the mining permits at issue, including obtaining its own bond to replace the letters of credit extended by Fulton Bank on the Debtors' behalf. (*Id.* at 6–7.)

---

[6] There are only two permits at issue in the instant appeal: the Branchdale Permit and the White Pine Permit. (Doc. 8-15, p. 3.) Accordingly, when referencing "the permits," the court refers to these two permits.

[7] More specifically, Rausch Creek lacked the legal authority to enter all of the land included as the subject of the permit. That was because a lease which the Debtors held, had expired and Rausch Creek was unable to renew it. (Doc. 8-15, p. 5.) Therefore, Rausch Creek lacked access to the "Dale Coal Area," which had been part of the original permits.

On July 8, 2019, the parties entered into a stipulation agreeing that, among other things, Rausch Creek would file an application for a new permit and would prosecute the application.  (*Id.* at 7.)  Specifically, the stipulation provided in important part that "Rausch Creek will file an application for a new permit that replaces all areas where Rausch Creek owns both surface and mineral rights within the White Pine Mine/Baby Boy Jarvis Permit, No. 58490102, not later than July 15, 2019 and will prosecute the application diligently."[8]  (*Id.*)

While Rausch Creek initially complied with the stipulation and filed a new permit application with the PA DEP (the "2019 Application"), Fulton Bank asserted in its motion that the new application was insufficient since the subject of the permit application did not cover all of the land that Fulton Bank's letters of credit covered.[9]  (*Id.* at 8.)  The bankruptcy court therefore held a hearing on Fulton Bank's motion to compel on January 29, 2020.  (*Id.*)

Following this hearing, on June 1, 2020, the bankruptcy court issued its *Kimmel I* opinion and order finding that "Rausch Creek did not assume liability *at Closing* for reclamation of the land . . . pursuant to the terms of the APA . . . [or] the Sale Order or any of its incorporated terms of sale."  (*Id.* at 8–9 (citation

---

[8] White Pine Mine/Baby Boy Jarvis Permit is the full name for permit number 58490102, but it more often referred to as the White Pine Permit.  (*See* Doc. 30, p. 39; Doc. 36, p. 10.)

[9] Fulton Bank complained that it would retain some degree of reclamation liability on the mining sites that Rausch Creek had purported to purchase in the APA based on Rausch Creek's permit application.

omitted).)  "The Court further held the APA and Sale Order likewise did not 'require Rausch Creek to obtain alternative facilities acceptable to the PA DEP to secure any obligation under the Permits after which the Fulton Letters of Credit would be canceled and withdrawn and Fulton would have no further liability or obligation thereunder.'"  (*Id.* at 9 (citation omitted).)  However, this decision left open the possibility that Rausch Creek could be required to secure a permit from the PA DEP and assume reclamation liability *after* closing on the APA.

Shortly after the bankruptcy court issued this decision, Rausch Creek withdrew its application with the PA DEP in favor of filing a new application (the "2020 Application), which reduced the amount of land covered by the permit and the bond requirement "from approximately 111 acres to only 21 acres."  (*Id.*)  In response, Fulton Bank filed a motion for contempt and a request for damages with the bankruptcy court.  (Doc. 17-49, p. 1.)[10]

On September 28, 2021, the bankruptcy court issued its *Kimmel II* opinion and order denying Fulton Bank's pending motion for contempt, granting Fulton Bank's motion to compel, and denying Fulton Bank's request for damages. (*Opinion at* Doc. 8-15.)  The main issue in that decision was "whether Rausch Creek is obligated to apply for transfer of the Permits and pursue liability for

---

[10] Actually, the request for damages was not raised in a motion itself but instead raised for the first time in one of Fulton Bank's briefs.  (Doc. 17-49, p. 1 n.2.)

reclamation of the Mines and to replace the Fulton Letters of Credit as part of that process." (*Id.* at 10.)  The bankruptcy court answered this question in the affirmative. (*Id.* at 11–29.)

On October 12, 2021, Rausch Creek filed a notice appealing *Kimmel II*, arguing that the bankruptcy court erred as a matter of law and otherwise abused its discretion. (Doc. 17-49, p. 3.)[11]  On the same date, Rausch Creek filed a motion to stay the appeal pending further proceedings with the bankruptcy court.  On October 15, 2021, the court stayed the appeal pending the ongoing bankruptcy court proceedings.  Despite the stay, the PA DEP and the Trustee filed answers to the notice of appeal, and Rausch Creek filed its brief on November 12, 2021.

On December 8, 2021, the Trustee filed a notice that the underlying bankruptcy proceeding had resolved and requesting that the stay be lifted.  In response, the court lifted the stay on December 10, 2021.  Thereafter, the court received briefs from the Trustee, Fulton Bank, and the PA DEP.  Rausch Creek timely filed reply briefs.

On August 26, 2022, this court concluded that the appeal by Rausch Creek stemmed from a "fundamental misunderstanding between the bankruptcy court and

---

[11] Rausch Creek's appeal was on this court's civil docket at *Rausch Creek Land, L.P. v. Fulton Bank, N.A.*, Civil No. 1:21-CV-01745.  Unless another citation is provided, the procedural history from the Rausch Creek appeal comes from that docket and is documented in this court's August 26, 2022 memorandum filed as Document 32 on that docket.

the parties with respect to the definition of the term 'transfer' in the context of Rausch Creek's purported purchase of the Debtors' assets in the APA, including its permits."  Accordingly, the court concluded that the appeal was premature and the appropriate course of action was to remand so the bankruptcy court could address the issues.  This court vacated the *Kimmel II* order and remanded for further proceedings.  (Doc. 17-43.)

On remand, in its *Kimmel IV* opinion, the bankruptcy court concluded that it should deny Fulton Bank's motion to compel, motion for a finding of contempt, and request for damages.  (Doc. 17-49, p. 1.)  The bankruptcy court considered the same central question in *Kimmel IV* as it had in *Kimmel II*: whether the sale documents obligated Rausch Creek to apply for mining permits "covering all or some portion of the Permitted Land and to assume liability for reclamation of same, including replacement of the Fulton Letters of Credit."[12]  (*Id.* at 4.)  It concluded that there were only two ways in which Rausch Creek could incur such an obligation.  The first was "by agreement of the parties as expressed in the Sale Order, APA, or Stipulation."  (*Id.* at 4–5 (footnote omitted).)  The second was pursuant to the state law mechanism for transferring mining permits, § 86.56 of 25 Pa. Code §§ 1.1 *et seq.*, which, in the bankruptcy court's words, "compels

---

[12] The court uses the term "sale documents" to refer to the universe of documents related to the Debtors' auction and sale.  This includes the APA, Sales Procedures, Sale Order, and all other documents incorporated therein.

assumption of existing reclamation liability whenever rights under a permit are transferred, assigned, or sold."  (*Id.* at 5 (citing § 86.56(c)(2)).)  The bankruptcy court also considered a secondary question of whether it should award Fulton Bank damages pursuant to its motion to compel "as a result of Rausch Creek's alleged 'use' of its Letters of Credit."  (*Id.*)

First, considering the APA and Sale Order, the bankruptcy court found that Rausch Creek had not taken on "any existing reclamation liability . . . except to the extent the permits are 'transferred' to it under § 85.56 of Pennsylvania mining law."  The bankruptcy court found four reasons for this conclusion.  First, the plain language of the APA and Sale Order unambiguously demonstrates that the "parties intended a transfer of the permits and the rights thereunder from the Debtors to Rausch Creek under Pennsylvania mining law."  (*Id.* at 6.)  Second, such transfers may only be made under § 86.56.  (*Id.* at 6–7.)  Third, the permits at issue have not been and cannot be transferred under § 86.56.  And fourth, the APA and Sale Order contain no sufficiently definite language to otherwise obligate Rausch Creek to assume "any existing reclamation liability associated with the permits or the Permitted Land" outside of a § 86.56 transfer.  (*Id.* at 7.)

The bankruptcy court noted that the Sale Order provides that "[a]ll transfers of the Assets, and of the Permits as set forth in the Auction Motion and Sale Motion are approved."  (Doc. 17-6, p. 5; *see also* Doc. 17-49, p. 7.)  Additionally,

the Sale Motion, which was incorporated into the Sale Order, states that Rausch Creek was "accepting the transfer of" four permits, which included the permits at issue here.  (Doc. 17-49, p. 7.)  Lastly, it noted that "the [Sales Procedures] refers to the word 'transfer' or some variation thereof in relation to the word 'permit' no less than 21 times."  (*Id.*)  It concluded that "the language in these documents is not ambiguous, defective, obscure or insensible and the intent of the parties can thus be determined from the express language of the Sale Order itself."  (*Id.*)

Next, the bankruptcy court noted that, under the plain language of § 86.56, "[a] transfer, assignment or sale of the rights granted under a permit may not be made except as provided in this section."  (*Id.* at 10.)  And the bankruptcy court noted that, under the same statute, transferees assume reclamation liability associated with the transferred permit.  (*Id.*)

The bankruptcy court also concluded that, even if the meaning of transfer, with respect to permits, was broader than § 86.56., it would make no difference. (*Id.* at 8–9.)  It observed that the definitions of "transfer" and "convey" are substantially similar to the point where the definition of "transfer" includes the word "convey" and vice versa.  (*Id.* at 9.)  It concluded that there was "no difference between the use of either word in the context of the APA (or § 86.56)" and as a result the words were "entirely interchangeable without impact as they relate to this matter."  (*Id.*)  On that basis, it rejected the proposition that a broader

definition of transfer "somehow expands the options available under State Law to accomplish the 'transfer' beyond those exclusively set forth in § 86.56." (*Id.*)  It continued that, even if it did, that "would not require Rausch Creek to assume reclamation liability because State Law will not impose such an obligation in the absence of a full transfer of the rights under a permit pursuant to § 86.56."

The bankruptcy court concluded that, pursuant to the sale documents, the parties only intended for Rausch Creek receive the permits by transfer, pursuant to § 86.56.  (*Id.* at 6–7.)  As it turned out, the permits could not be transferred in that way, and there was no other language in the sale documents obligating Rausch Creek to assume liability.  (*Id.* at 7.)  Similarly, the bankruptcy court concluded that Rausch Creek had not assumed, and was not obligated to assume, reclamation liability under the stipulation.  (*Id.* at 16–19.)  Because both the 2019 and 2020 Applications complied with its obligations under the stipulation, it was not in contempt.  (*Id.* at 18.)  Lastly, the bankruptcy court concluded that Fulton Bank's request for damages was not ripe, so it denied the request without prejudice.  (*Id.* at 20.)  The bankruptcy court's implementing order denied Fulton Bank's motion to compel, motion for a finding of contempt, and request for damages.  (Doc. 8-17.)

Because the issues on appeal largely involve contract interpretation, the court will now provide some pertinent aspects of the sale documents beginning with the APA.  Section 2.1 of the APA defines the term "Real Property Purchased

Assets," which included in part the following language in subsection (c), "[t]o the extent transferrable to Buyer, all Permits, licenses, existing bonding, orders, approvals and other authorizations of any Governmental Body owned, held or used by Sellers, in or related to the ownership of the Real Property or operation of the Businesses." (Doc. 17-1, p. 36.)

Section 2.6 defines "Excluded Liabilities," which "Buyer shall not assume or be obligated to pay, perform or otherwise discharge." (*Id.* at 38–39.) Subsection (d) of Section 2.6 states that "any liabilities under any consent, order, decree or Contract between Sellers and the DEP" fall under the umbrella of Excluded Liabilities. (*Id.* at 39.)

Section 8.5 of the APA specifically contemplates how the obligations of the parties relate to the acquisition of approval from third-party regulators. (Doc. 17-1, p. 59.) Subsection (a) provides in part that "[d]uring the period prior to the Closing Date, Buyer shall use commercially reasonable efforts to cooperate with Sellers to obtain the consents, approvals and waivers contemplated by this Section 8.5(a)." (*Id.*) Subsection (b) further provides that Sellers and Buyer would use reasonable efforts to "(1) obtain any consents and approvals of any Governmental Body required to be obtained by them in order to permit the consummation of the transactions contemplated hereby or (2) otherwise satisfy the conditions set forth in Sections 10.1 and 10.2." (*Id.*)

12

Section 10.2 outlines "Buyer's Conditions to Closing."  (*Id.* at 62.)

Specifically, Section 10.2(g) instructs that "Buyer shall have obtained all Permits

required to operate the Businesses, either by transfer of Sellers' Transferable

Permits to the extent permitted by law **or by Buyer's receipt of new Permits**."

(*Id.* at 63 (emphasis added).)

Section 8.6 of the APA is titled Avoiding Abandonment.  (*Id.* at 59.)

Subsection (a) states the following in full:

> To the extent permitted by applicable law, rule or regulation, Sellers
> hereby authorize Buyer to operate under each Permit related to the
> Businesses after the Closing, as necessary to enable Buyer to conduct
> the Businesses while Buyer seeks to **replace** such Permits with its own
> Permits (such Permits, the **"Transferable Permits"**). Buyer shall
> promptly after execution of this Agreement prepare and submit the
> necessary applications (the "Buyer Applications") to the applicable
> Government Body, to obtain the Permits required to operate the
> Business. Sellers will take all steps reasonably necessary to maintain
> their authorizations under the Transferable Permits that Buyer operates
> under during the period between Closing and the issuance of Buyer's
> own Permits and Sellers will cooperate with Buyer in preparing and
> submitting the Buyer Applications.

(*Id.* (emphasis added).)

The Sales Procedures incorporated the APA and included it as an

attachment, "along with the accompanying schedules, to properly reflect the Assets

being sold."  (Doc. 17-1, p. 7; Doc. 8-15, p. 4.)  Paragraph 15 of the Sales

Procedures acknowledges the following:

> The Permits may only be transferred, as opposed to being assumed and
> assigned, by the Debtors to a third party subject to approval by the

> Pennsylvania PADEPartment [sic] of Environmental Protection ("PADEP"). The Debtors are responsible to request from PADEP transfer of any of the Permits from the Debtor, or a third party owner [sic] of such permits involving the Debtor, to the Successful Bidder by including, but not limited to, filing a request to transfer all applicable permits to the Successful Bidder.  The Successful Bidder may choose which permits it wants transferred to the Successful Bidder. The Successful Bidder or Rausch shall provide its list of the permits it wants transferred to it on or before September 14, 2018.

(Doc. 17-1, p. 5.)  Paragraph 14 of the Sales Procedures states that the "mining and other permits (the 'Permits') are itemized as set forth in the schedules to the [APA] set forth in paragraph 24 below."  (*Id.*)  Paragraph 24 provides in part that "The Debtors have entered into an [APA] with [Rausch Creek] for the sale of the Assets (the "Agreement") for $5,500,000.00."  (*Id.* at 7.)

On February 27, 2023, Fulton Bank filed a notice of appeal of the *Kimmel IV* order.  (Doc. 1.)  In March, this court granted the motions to intervene filed by the PA DEP and the Trustee.  (Docs. 5, 7.)  On April 5, 2023, the court received copies of the designated record.  (Docs. 8–28.)  Fulton Bank, the PA DEP, and the Trustee filed their briefs in support of the appeal.  (Docs. 30, 34, 35.)  Rausch Creek filed its brief in opposition.  (Doc. 36.)  Thus, the matter is ripe for resolution.

## STANDARD OF REVIEW

The court reviews bankruptcy court decisions of law de novo.  *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999).  The bankruptcy court's findings of fact will only be set aside if clearly erroneous.  *Shovlin v. Klaas*, 555

B.R. 500, 503 (W.D. Pa. 2016) (citation omitted).  A finding of fact is clearly erroneous when it leaves the reviewing court "with a definite and firm conviction that a mistake has been committed." *In re W.R. Grace & Co.*, 729 F.3d 311, 319 n.14 (3d Cir. 2011).  A district court reviews a bankruptcy court's exercise of discretion for abuse thereof.  *In re Friedman's Inc.*, 738 F.3d 547, 551–52 (3d Cir. 2013).

When reviewing a contract dispute, "the initial determination is whether the contract is ambiguous concerning the dispute between the parties, an issue of law afforded plenary review." *Sumimoto Machinery Corp. of Am., Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996); *In re H.K. Porter Co., Inc.*, 379 B.R. 272, 278–79 (W.D. Pa. 2007).  When a dispute revolves around the intent underlying a contractual term, "discerning contractual intent is a question of fact unless the provisions of a contract are wholly unambiguous." *In re Barclay Indus., Inc.*, 736 F.2d 75, 78 n.3 (3d Cir. 1984) (cleaned up) (citation omitted).

### DISCUSSION

Fulton Bank raises four discrete issues in its brief in support of its appeal.[13] (Doc. 30.)  First, it asserts that the Bankruptcy Court erred in refusing to enforce the intent of the parties, which was to require Rausch Creek to apply for the

---

[13] In its statement of issues on appeal, Fulton Bank presents a slightly different list of seven issues, but in this memorandum the court will address the issues argued in the brief.  (Doc. 8, pp. 1–2.)

Debtors' rights under the White Pine and Branchdale permits and assume reclamation liability.  (*Id.* at 2.)  Second, the Bankruptcy Court erred in not enforcing the stipulation insofar as it required Rausch Creek to prosecute the 2019 Application to its conclusion.  (*Id.* at 23.)  Third, the Bankruptcy Court erred in failing to hold Rausch Creek in contempt for violating the terms of the stipulation. (*Id.* at 2.)  And fourth, the Bankruptcy Court erred in "not holding Rausch Creek liable for the costs of the reclamation under the [Permits] created by Rausch Creek's mining activities in 2018 and 2019." (*Id.*)  The court will address each of these issues in turn.

### A. The sale documents are ambiguous regarding the meaning of transfer and the extent to which they obligate Rausch Creek to assume Debtors' reclamation liability.

Fulton Bank argues that the bankruptcy court committed two errors in interpreting the sale documents.  First, it rejected the intention of the parties and instead substituted its own interpretation of the written documents related to Debtors' sale to Rausch Creek.  (*Id.* at 17–18.)  Fulton Bank argues that the clear intent of the parties was for Rausch Creek to assume the permits to whatever extent possible, adopting whatever benefits and liabilities came with them.  Second, it altered the APA's language by imposing a definition on the term "transfer" that the parties did not adopt.  (*Id.* at 18.)

16

Fulton Bank recognizes, as did the bankruptcy court, that in contract interpretation, the "true north" is the intent of the parties.  (Doc. 30, p. 19 (citing *Robert F. Felte, Inc. v. White*, 451 Pa. 137 (1973)); Doc. 17-49, p. 5 (citing *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011)).)  A court must give effect to a contract's clear and unambiguous language.  *Tindall v. Friedman*, 970 A.2d 1159, 1165 (Pa. Super. 2009).  Furthermore, "a contract should be read so as to give meaning to all of its terms when read as an entirety."  *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987).  Under Pennsylvania law:

> A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.

*In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (citation omitted).

Fulton Bank argues that the bankruptcy court erred in applying these cannons of contract interpretation.  Specifically, once the bankruptcy court determined that the parties intended by contract to require Rausch Creek to apply to the PA DEP to acquire the mining rights held by Debtors and to assume all reclamation liability, the analysis should have ended.  (Doc. 30, p. 21.)  Specifically, Fulton Bank notes that the bankruptcy court, in the following passage

17

of its opinion, clearly understood that the parties intended for Rausch Creek to assume reclamation liability:

> The Court has little doubt based upon the record before it—including representations, statements, and filings made by Rausch Creek itself—that the parties believed Rausch Creek would assume all preexisting reclamation liability associated with any permit transferred as part of this transaction.  However, the Court is equally confident that the parties presumed such assumption of liability would occur pursuant to § 86.56 exclusively and that all the permits would be transferred without complication.

(Doc. 17-49, p. 20 (footnote omitted).)  At that point, Fulton Bank argues that the bankruptcy court should have simply enforced the intention of the parties as written in the APA.  By failing to do so, Fulton Bank asserts that the bankruptcy court committed reversible error.  (Doc. 30, p. 21.)

Second, Fulton Bank argues that the bankruptcy court adopted a meaning of transfer that was unsupported by the evidence.  (*Id.*)  The APA defines many terms, but not "transfer."  Fulton Bank argues that, by imposing a "specific and narrow" meaning of "transfer," the bankruptcy court "materially altered the contract in a manner contrary to the parties' intent."  (*Id.*)  Further, by incorporating the PA DEP's regulations, which are never referenced either specifically or generally, the bankruptcy court "manufactured out of whole cloth" a definition "not supported by any language in the APA, nor by any parol evidence." (*Id.* at 22.)

In response, Rausch Creek argues that there was no ambiguity in the sale documents.  (*See* Doc. 36, p. 19.)  It asserts that these documents only obligated Rausch Creek to "replace Letters of Credit or reclamation liability upon <u>transfers</u> of the Permits."  (*Id.*)  It asserts that "[n]othing can be more clear than the word 'transfer' under the APA and there is a corresponding statutory procedure to transfer a mining permit."  (*Id.*)

It argues that Section 2.6(d) of the APA rejects the prospect that Rausch Creek assumed any type of liability of the Debtors related to or consisting of reclamation liability.  (*Id.* at 20.)  It points out that subsection 2.6(d) specifically states that Rausch Creek was not assuming liability in connection with "'any liabilities under any consent, order, decree or Contract between' the Debtors and the PADEP."  (*Id.*)  It asserts that the *only way* Rausch Creek could become liable for reclamation under the APA or any associated documents was by mechanism of transfer under § 86.56.  (*Id.*)  Rausch Creek asserts that it has never "unconditionally agreed to <u>replace </u>Fulton Bank's Letters of Credit for the reclamation liability caused by the Debtors and associated with the Permits or assume such reclamation liability."  (*Id.* at 21 (emphasis in original).)

On *de novo* review of the issue of whether the contractual language is ambiguous, the court concludes that, contrary to the bankruptcy court's finding, the APA and other sale documents were ambiguous in their use of the word "transfer"

with respect to the permits.  The bankruptcy court adopted a plausible reading of the term "transfer," perceiving it to be specifically related to 25 Pa. Code § 86.56. However, this reading is problematic because portions of the documents are in tension with this reading.  In fact, this court concludes that the contract language is ambiguous as to whether Rausch Creek was obligated to assume liability for reclamation of "all or some portion of the Permitted Land," including "replacement of the Fulton Letters of Credit."  (Doc. 17-49, p. 4.)

In reaching this conclusion, the court begins by observing that the APA alone has over 100 defined terms, and the Sales Procedures adds more definitions. (Doc. 17-1.)  Because transfer is not one of the 100-plus defined terms, the court looks to the ways the term is used in the contract documents to see if it is capable of being understood in more than one sense to determine if it is ambiguous. Through this analysis, the court looks at whether there is ambiguity in how the parties' intended for Rausch Creek to acquire permits or assume reclamation liability.

In conducting this review, the court finds that some instances where the word transfer is used could suggest that the parties intended the term to refer to the mechanism of transferring permits under § 86.56.[14]  But other instances use a

---

[14] *See* paragraph 15 of the Sales Procedures and Sections 2.1(c) and 10.2(g) of the APA.  (Doc. 17-1, pp. 5, 36, 63.)

broader definition of transfer, suggesting that the benefits or burdens contained in a permit could be conveyed to Rausch Creek in myriad ways, whether by transfer, replacement, or otherwise.[15]

To amplify the cited contrasting usages of the term transfer in the previous paragraph, one example of this ambiguity is found in the definition of "Transferable Permits" provided in subsection 8.6(a). (Doc. 17-1, p. 59.) As noted in the Background section of this memorandum, such permits are not to be acquired by the Buyers solely by means of transfer. Instead, the Buyer is to "replace such Permits with its own Permits." (*Id.*) And in subsection 8.6(b), the Seller is required to "relinquish" permits rather than explicitly "transferring" them, let alone any reference to § 86.56. (*Id.*) This suggests that the parties did not envision only one mechanism for the conveyance of permits, but a variety of approaches the Buyer might utilize to end up with the required permits.

The court also finds the language of subsection 2.1(c) of the APA to be ambiguous with respect to the phrase "to the extent transferrable." This subsection includes in the Real Property Purchased Assets, "[t]o the extent transferrable to Buyer, all Permits, licenses, existing bonding, orders, approvals and other

---

[15] *See* paragraph 48 of the Sales Procedures and Sections 2.1(c), 8.6(a), 8.6(b), and 10.2(g) of the APA. (Doc. 17-1, pp. 13, 36, 59, 63.) The court includes Sections 2.1(c) and 10.2(g) of the APA in both this footnote and the immediately preceding footnote because their text is especially vulnerable to ambiguous meaning in the context of this dispute.

authorizations of any Governmental Body owned, held or used by Sellers, in or related to the ownership of the Real Property or operation of the Businesses." (*Id.* at 36.)  This passage easily offers multiple plausible readings.  First, "to the extent transferrable to Buyer" could indicate an all or nothing condition—that if a permit, license, existing bond, order, etc., may be transferred in its entirety to Buyer, it is included in Real Property Purchased Assets.  And, if it cannot be fully transferrable, then no part of it is included.  This is how the bankruptcy court interpreted the APA in *Kimmel IV*.  (Doc. 17-49, p. 6.)  But there is an alternative, yet equally plausible reading—to the extent that any permit, license, etc., can be transferred, whether in full or in part, it is included in Real Property Purchased Assets.[16]  This latter interpretation is equally common-sensical and plausible and is one that the bankruptcy court actually adopted in its *Kimmel II* opinion.  (Doc. 8-15, pp. 18–21.)

---

[16] This, according to the Trustee, is the proper understanding of the sale documents.  The Trustee points out that counsel for the Pennsylvania Department of Mining suggested as much during a hearing the bankruptcy court held on November 9, 2021.  (Doc. 35, p. 16.)  The Department's counsel stated that, in a perfect world, a party might enact a § 86.56 transfer, but more often than you might think, parties instead take over permits that cannot be transferred.  (*Id.*)  This type of takeover does not seem to be a "transfer, assignment or sale of the rights granted under a permit" as explained in the statute.  § 86.56.  Instead, a party can still "take over part, or most of, that underlying permit."  (Doc. 35, p. 16 (". . . Rausch Creek did just that with the 2019 permit application.  It came in and sought a new permit with permit boundaries that were essentially the same because it included the Dale Coal tracks, but we just X them out and say you don't have the right to mine these areas you can't bond them, but it's like a donut hole, you know, within that original permit boundary.")

Indeed, only a few provisions in the contract documents suggest that "transfer" was understood as a term of art, let alone a mechanism solely accomplish by § 86.56.  The only text clearly implying that  "transfer" could be a term of art is paragraph 15 of the Sales Procedures.  This paragraph provides that the "Permits may only be transferred, as opposed to being assumed and assigned, by the Debtors to a third party subject to approval by the [PA DEP]."  (Doc. 17-1, p. 5.)  This passage clearly distinguishes the term transfer from assumption or assignment.

But even in this example, the court notes that paragraph 15 still provides no definition for the term "transfer."  This paragraph does not reference any statutory language, let alone § 86.56.  And, although § 86.56 is a mechanism overseen by the PA DEP, this passage could be reasonably understood to simply mean that no permit may be conveyed from Debtors to Buyer except by approval of the PA DEP whether in part or entirely.  The court does not adopt this reading of the provision, but merely provides it as an example of the ambiguity present in the sale documents.

Other portions of the sale documents appear to contemplate Rausch Creek's acquisition of permits in a manner that is separate from or in addition to § 86.56. For example, the Section 8.6(a) provision for avoiding abandonment authorizes Buyer to operate "under each Permit . . . as necessary to enable Buyer to conduct

23

the Businesses while Buyer seeks to replace such [Transferable] Permits with its own Permits."  (Doc. 17-1, p. 59; *see* Doc. 30, p. 40.)  This provision further requires Buyer to "submit the necessary applications . . . to the applicable Government Body, to obtain the Permits required to operate the Business."  (Doc. 17-1, p. 59.)  From the language in this provision, Rausch Creek's pursuit of permits is not limited to transfers.

Section 8.6(b) similarly indicates that Buyer may reasonably need to "obtain any required DEP Permits."  (*Id.*)  Additionally, Section 10.2(g) states that the Buyer might "obtain all Permits required" either by "transfer of Sellers' Transferable Permits to the extent permitted by law or by Buyer's receipt of new Permits." [17]  (*Id.* at 63.)

The other sales documents are likewise ambiguous regarding to what extent Rausch Creek was obligated to take on reclamation liability.  Paragraph 48 of the Sales Procedures provides that "[a]ll Letters of Credit or bonds needed for the permits which are to be transferred, assumed or replaced by the Successful Bidder that the Successful Bidder accepts transfer of in connection with the purchase of the Assets are to be provided by the Successful Bidder."  (Doc. 17-1, p. 13; *see also* Doc. 30, p. 40.)  This paragraph demonstrates that the parties understood that

---

[17] Additionally, Section 8.5(b) requires Seller to take all steps "reasonably necessary to relinquish the Permits."  (Doc. 17-1, p. 59.)

the permits might be conveyed not only by transfer, but possibly by assumption or replacement.  And the successful bidder, which turned out to be Rausch Creek, would be required to provide the required letters of credit for the permits regardless of whether they were conveyed by transfer, replacement, or assumption.  (Doc. 17-1, p. 13.)  Although this is a reasonable reading, the court observes that this paragraph does not explicitly state that Rausch Creek, in the event of a successful transfer, would have to take over and provide new letters of credit for Debtors' prior reclamation obligations.

In sum, as explained above, the sale documents are susceptible to different interpretations and capable of being understood in more than one sense with respect to the conveyance or "transfer" of permits, and associated assets and liabilities, from Debtors to Buyer.  In short, the term "transfer," as used with respect to the permits, is ambiguous.  Because the terms "transfer" and "to the extent transferrable" are ambiguous with respect to the permits, so too is the extent to which Rausch Creek is obligated to assume reclamation liability.  This ambiguity must be resolved through examination of parol evidence.  *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 846 (3d Cir. 2020) ("To resolve a contract's ambiguity, we look to extrinsic or parol evidence . . .").

The consideration of parol evidence to resolve the ambiguity of the contract language is best done by the bankruptcy court.  *See In re Old Summit*, 523 F.3d at

137 (citation omitted) ("[T]he resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.").[18] Therefore, the court will remand this issue to the bankruptcy court.  Specifically, the bankruptcy court should review the pertinent parol evidence to determine the intent of the parties regarding the meaning of transfer, the obligation of Rausch Creek to assume reclamation liability, and all issues flowing therefrom.

### B. The bankruptcy court erred in interpreting the stipulation.

The PA DEP argues that the bankruptcy court erred in holding that Rausch Creek had not agreed to take on Debtors' reclamation liability pursuant to the stipulation.[19]  The PA DEP asserts that the bankruptcy court erred because it failed to consider all of the provision in the stipulation.  (Doc. 34, p. 14.)  Specifically, the PA DEP argues that, pursuant to the stipulation, "Rausch Creek agreed to replace 'all areas,' including the bonded area, i.e. the pre-existing reclamation liability."  (Doc. 34, p. 15.)

---

[18] An "appellate court may draw its own inferences and arrive at its own conclusions when a finding of fact is simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning." *In re Old Summit*, 523 F.3d at 137.  Therefore, a court may always "consider the course of performance as evidence of the intent of the parties." *Id.* (citation omitted).  But here, the relevant parol evidence goes beyond performance and includes testimony of the parties, intervenors, and witnesses.  Therefore, the bankruptcy court is in the best position to weigh the evidence as the trier of fact.

[19] Fulton Bank raises this argument as well, but the court addresses the PA DEP's as it is more developed and relies more explicitly on the designated record.  (*See* Doc. 30, pp. 23–24; *see also* Doc. 34, pp. 14–17.)

The PA DEP asserts that, in its analysis, the bankruptcy court omitted a key provision of the stipulation in which Rausch Creek agreed that it would "file an application for a new permit that replaces **all areas where Rausch Creek owns both surface and mineral rights**." (Doc. 34, p. 15 (emphasis added by the PA DEP) (quoting Doc. 17-49, p. 17).)  The PA DEP argues that this language is significant because, not only does it expressly obligate Rausch Creek to file a new permit application, it obligates them to seek to obtain a new permit to "replace all areas where Rausch Creek owns both surface and mineral rights." (*Id.*)  In this instance, the PA DEP argues, the term "'replace all areas' includes the permit boundary area and the bonds on the bonded area." (*Id.* at 15–16.)  Replacing that bonded area, in turn, requires that Rausch Creek "replace the Debtors' bonds under 25 Pa. Code § 86.166." (*Id.* at 16 n.3.)  This bonded area would only exclude the Dale Cole Area. (*Id.* at 15.)

The PA DEP asserts that Rausch Creek's 2019 Application followed through on its obligation and demonstrated its intention to do so. (*See id.* at 16.)  Its withdrawal of the 2019 Application and subsequent submission of the 2020 Application did not fulfill its obligations under the stipulation. (*Id.*)  The PA DEP also points out that counsel for Rausch Creek made various representations to the bankruptcy court indicating that it intended to take over the Debtors' reclamation liability. (*Id.*; Doc. 13, p. 10.)  Therefore, the PA DEP asserts that, even if the sale

documents do not expressly require Rausch Creek to take over Debtors'
reclamation liability, the stipulation does because it states: "except for the Dale
Cole Area, Rausch Creek [is] obligated to take over the entire bonded area, i.e., the
Debtors' pre-existing reclamation obligation."[20]  (Doc. 34, pp. 16–17.)

　　　Likewise, the Trustee implicitly argues that the stipulation unambiguously
requires Rausch Creek to assume reclamation liability "for the entire purchased
area previously covered" by the permit.  (Doc. 35, p. 22.)  He further argues that, if
this court disagrees and finds the stipulation ambiguous, it should look beyond the
four corners of the stipulation to conclude that Rausch Creek was agreeing to
assume reclamation liability for all purchased areas previously covered by the
permit.  (*Id.*)

　　　In response, Rausch Creek argues that the bankruptcy court did not abuse its
discretion in ruling that the stipulation did not require it to assume any of the
Debtors' mining reclamation liability.  (Doc. 36, p. 22.)  Rausch Creek argues that
the stipulation was an interim agreement, the intent of which "was never to resolve
disputed liability."  (*Id.* at 23.)  Rausch Creek further asserts that paragraph 7 of
the stipulation indicates that issues not specifically addressed are reserved by the
parties.  (*Id.*)  Rausch Creek implies that the discrepancy between its 2019 and
2020 Applications, the former adopting liability for 111 acres while the latter only

---

[20] Fulton Bank makes essentially the same argument.  (Doc. 30, pp. 23–24.)

adopted liability for 21 acres, was due to an administrative error.  (*Id.* at 24; *see*

Doc. 8-15, p. 9.)[21]

The PA DEP is correct insofar as the bankruptcy court failed to analyze all

terms of the stipulation.  Specifically, in *Kimmel IV*, the bankruptcy court does not

address whether the 2019 Application or 2020 Application "replaced all areas

where Rausch Creek" owns both surface and mineral rights within the White Pine

Permit, which is the terminology in the stipulation.  Instead, it assessed whether the

stipulation required Rausch Creek to file an application "covering the Real

Property (only) and to pursue that application" diligently.  (Doc. 17-49, p. 17.)

The court is unaware of the provenance of the term "Real Property (only)."  It does

not appear in the stipulation.

The stipulation, both in the language of paragraph 1 and the "whereas"

clauses, which provide context, appears to not have a limitation to real property.

Indeed, paragraph 1 of the stipulation requires a new permit that "replaces all

areas" where a condition is met.  That condition is that Rausch Creek owns both

surface and mineral rights within the White Pine Permit.

---

[21] In its *Kimmel II* opinion, the bankruptcy court considered Rausch Creek's explanation that administrative error led it to submit the 2019 Application which, once approved, would have obligated Rausch Creek to assume reclamation liability. (Doc. 8-15, p. 28 n.27.)  The court did "not find this explanation to be credible in view of significant evidence to the contrary."  (*Id.*)

The bankruptcy court did not analyze or apply (i) the meaning of "all areas" where Rausch Creek owns both surface and mineral rights or (ii) the extent to which the 2019 and 2020 Applications "replaced" all areas.  On remand, the bankruptcy court should address these matters and resolve all issues flowing therefrom.  To the extent that the bankruptcy court concludes these terms are ambiguous, it should examine parol evidence to determine the intended meaning.

### C. The court will deny the appeal with respect to the contempt issue because it is derivative of the stipulation and therefore not ripe.

Fulton Bank requests a finding that the bankruptcy court erred by failing to hold Rausch Creek in contempt.  (Doc. 30, pp. 33–36.)  But a finding of contempt is dependent on the interpretation of the stipulation.  Because the bankruptcy court must further assess the meaning of the stipulation, the contempt issue is not yet ripe.  Therefore, the court will deny Fulton Bank's appeal in that respect without prejudice.

### D. The court will deny the appeal with respect to Fulton Bank's request for monetary damages.

In asserting that the bankruptcy court erred in failing to award Fulton Bank monetary damages, Fulton Bank's argument falls far short.  Fulton Bank provides very few citations.  (Doc. 30, pp. 37–38.)  The few citations it provides cite solely to Randy Shustak's deposition, but that deposition does not appear to be part of the record which Fulton Bank designated.  (*See* Doc. 8, pp. 3–4.)  On a bankruptcy

appeal, "[a]ppellants have the burden to provide a complete record." *In re Olick*, 466 B.R. 680, 689 (E.D. Pa. 2011) (citing *In re CPDC Inc.*, 221 F.3d 693, 698 (5th Cir. 2000)).  Without a properly submitted record to support its argument, Fulton Bank cannot show that the bankruptcy court committed clear error.  Therefore, the court will deny Fulton Bank's appeal with respect to its argument for monetary damages.

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part the appeal, vacate the bankruptcy court's order, and remand for further proceedings. (Doc. 1.)  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: January 17, 2024